Whyte, J.
delivered the opinion of the court.
This case has been argued with ability by the coun-" sel for the defendant in error, in support of the judgment rendered by the circuit court; but upon two grounds appearing upon the face of the record, the court is of opinion the judgment cannot be sustained. First; because the levy of the execution, which issued against the lands, &c. of Donelson, is insufficient. The levy is in these words: “Levied on eight thousand acres of land, lying in four different tracts; April 28,1810.” “This day sold the above lands on twelve months credit, to Henry Pugh and Henry Gibson, for the sum of twenty-three dollars forty-seven cents.” This levy is bad, for its vagueness and uncertainty; its location is not more definite than the bounds of the county of Stuart, and this restriction is only arrived at by implication, because the power of the sheriff did not extend *340 beyond these bounds. The levy ought to show the location of the lands levied on to a reasonable certainty. Both the interest of the execution creditor and debtor require this, as also does the general interest of the community. This is also the evident policy of our acts of Assembly, as is plainly, even demonstrably shown by the provisions of the act of 1799, ch. 14, and other acts regulating the conduct and prescribing the duties of sheriffs upon executions. The above act of 1799, ch. 14, in terms requires a description of the lands particularly, and for the most obvious reason, to procure the attendance at the time of sale, of bidders and purchasers; can this be expected without a knowledge of the lands? and can this knowledge be acquired without an actual examination, either personal or communicated, a “pedis positio” which, without reasonable information given of their local situation by the levy, and advertisements consequent thereupon, cannot be had; but when given confers on the public the power of examination of the lands, by all who may be inclined to purchase, if the lands should please them, after such examination.
It is to be observed, that it is the view of the law, and it results to the good of society, that the unfortunate and delinquent execution debtor, should make satisfaction, through the operation of legal process, without the intervention of fraud, or oppression, or any unnecessary sacrifice of property; which salutary purpose would be defeated, by suspending clouds of doubt and uncertainty over the execution of its process. No man of common prudence could be expected to make a bid at an execution sale under such circumstances; and the field being left open for the deepest speculation,’ the bid of a trifle, if it should turn out successfully, might-in many cases involve the debtor in absolute ruin. The present instance of a purchase of 8,000 acres of land for $>23 47 cents, shows what results may proceed from *341 a laxity of conduct in the discharge of official duties.
The second ground upon which the judgment in favor of the defendant in error must he reversed, is based upon the restrictions enacted in the second section the 37th chapter of the act of 1801. The act of congress had extended its protection to the lands comprised within the purview of this act, before its passage; hut as auxiliary thereto, in diffusing more generally a knowledge of that protection, which might have been transgressed from a misunderstanding by some, of the effect of the last clause of the first section, extending the boundaries of the county of Montgomery, embracing Indian lands within its limits. To prevent therefore a misconception that such extension of boundary was not an extension of state jurisdiction, similar to that exercised and held in the counties already settled, and not covered by the Indian claim, was probably the reason of enacting this second section by the legislature. Be that as it may, this second section is not the less effectual by going hand in hand with the act of Congress. This section says, that nothing in this act contained, shall be so construed as to authorize any person whatever to violate the law of the United States, so far as it relates to such parts of said counties lying within the Indian boundary: and that nothing therein contained shall he so construed as to authorize the sheriffs of either of the aforesaid counties, to levy executions, or sell any real property lying within the Indian boundary, until the same is extinguished, any law to the contrary notwithstanding.
The effect of these two clauses, so far as it regards the present case, is precisely the same; for the levy of an execution and sale prohibited by the last, would have been a violation of the laws of the United States under the first; and the double expression of the same sentiment exhibits only the earnest desire of the legislature, that its will so expressed should be observed and obey *342 ed. The subsequent division of Montgomery county,in the year 1803, ch. G3, by which a portion of its limits covered by the Indian claim, was constituted into a separate and distinct county, called and distinguished by the name of Stuart, does not affect the second section of the act of 1801; for the restrictions of 1801 were imposed upon the territory covered by the Indian title, and not upon the civil and political division of country. These restrictions therefore remain attached to the territory upon which they were placed, no provision being made in the later act of 1803, to displace or remove them. The Indian claim was not removed from them until sometime in the year 1813.
The judgment of the circuit court must therefore be reversed, and the cause remanded for a new trial to be had therein.
Judgment reversed.